Samuel Robertson, Jr., Appellee, v. Louisville and Nashville Railroad Company, Appellant.

Term No. 45M8.

Heard in this court at the May term, 1945. Opinion filed October 26, 1945. Released for publication November 27, 1945.

HAROLD BALTZ, of Belleville, for appellant.

PHILIP G. LISTEMAN, of East St. Louis, and LLOYD MIDDLETON, of St. Louis, Mo., for appellee.

MR. JUSTICE BARTLEY delivered the opinion of the court.

Appellee sued the appellant railroad, under the Federal Employer's Liability Act to recover for injuries to his back received while at work as a trucker in the East St. Louis freight yards of the railroad. A jury awarded appellee a verdict of $7,500. The trial court overruled motions for a new trial and for judgment notwithstanding the verdict and the case is here on an appeal brought by the railroad company.

The appellant charges that the verdict of the jury is contrary to the clear weight of the evidence and that the damages awarded are excessive. These are the only two errors relied upon.

The negligence charged is that a broken, damaged and unsafe "car mover" was supplied to appellee which failed to work, causing him to fall and sustain the injuries complained of. While the record does not contain a technically accurate description of the tool, it appears that it is a metal device with a wooden handle designed to move a railroad car by exertion of pressure against the wheel. It is manually operated by working the handle up and down. Its use is apparently confined to cases where it is necessary to move the car very short distances.

It was stipulated at the trial that interstate transportation was involved and the only questions raised on this appeal are that the verdict and judgment are against the clear and manifest weight of the evidence and that the verdict is excessive, having been influenced by passion and prejudice.

The case was tried on the theory that the accident complained of took place on March 15, 1943. The appellee testified that he thought that was the date of the occurrence. His original complaint alleged that he was injured in the month of February 1943, and he did

not deny that in a deposition taken January 28, 1944, he stated that he was not hurt on March 15, but during the latter part of February.

The evidence shows that appellant railroad maintained a freight terminal in East St. Louis and that railroad tracks ran parallel to the freight house on its north side. Track No. 28 lay immediately north of and adjacent to the unloading platform of the freight house and cars on this track were unloaded directly on said platform. Track No. 27 lay immediately north of and parallel to track No. 28. The practice followed in unloading from a car on track No. 27 was to "spot" or place the car directly along side of and parallel to an empty car on track No. 28 so that the side doors of each were in juxtaposition. A steel platform was then placed through both sets of doors and the freight was transported over this steel platform, through the empty car on track No. 28 and thence to the unloading platform of the freight house. This operation required the two cars to be placed directly along side of each other and where a car had to be moved a few feet to place it in such position, the moving was done by hand with the aid of a car mover and a pinch bar.

Appellee was his only occurrence witness. He testified that he had worked for appellant railroad as a trucker for over a year prior to the accident; that his duties consisted of transporting freight from cars to the warehouse or to other vehicles for carriage beyond his terminal; that he worked in a group, or to use the vernacular, a "gang" of five men consisting of T. A. Doyle, a checker, Arthur Jordan, a picker, Mose Reed, "Doc." Harrison, and himself. The latter three were truckers.

With reference to the accident in question, appellee testified that shortly after noon on March 15, 1943, a car had to be unloaded from track No. 27; that it had to be moved some 8 or 10 feet to place it opposite an

empty car, previously unloaded, on track No. 28; that only one car mover was available and that he had previously used it in similar operations; that two or three days before, he saw the car mover slip and fail to work properly, and when Edward Pfarrer, the foreman, ordered him to get the tool and move the car up, he called Pfarrer's attention to the fact that it had "Slipped the other day." Pfarrer, appellee testified, then said "Yes, we had it worked on, see how it works now." The appellee then went to the office where the car mover was kept, brought it out, adjusted it to the rail and the car wheel at the southeast corner of the car; that when he first pressed downward on the lever, he moved the car some 10 or 12 inches and that the tool was "working fine"; that he then renewed the pressure by bearing down on the handle or lever and that the mover slipped and the handle on which he was pushing fell to the ground; that he fell. He described the fall by saying, "I hit the middle of the track and twisted my back and my back fell across the tracks." On cross-examination, he amplified his account by saying that he fell forward between the two rails of track No. 27, striking the palm of his right hand on the cinders; that he then twisted to the left and landed with the small of his back across the south rail of track No. 27. Prior to the fall, he says that he was standing in the space between tracks No. 27 and 28 south of track No. 27 and facing north.

Appellee positively testified that he was moving the car without assistance from any other members of his group; that a man whom he knew as "Andy" was nearby; he does not account for the whereabouts of the other members of the group at the moment of the fall.

Appellee testified that after falling, he arose, told the foreman, Pfarrer, that he had fallen, went into the washroom, washed the cinders from his hands, that his

hand was bleeding slightly; that Pfarrer applied mercurochrome to the hand, and directed him to do light work the rest of the day when he complained that his back was hurting him.

Appellee further testified that he worked out the day and reported for work on March 16, but was sent by Pfarrer to Dr. McQuillan; that he went to this doctor four or five times; that he worked up to March 27, 1943, when he joined the Army; that after a short stay at Scott Field, he was sent to a camp at Salt Lake City, where he worked one day lifting logs and that his back bothered him so that he reported sick. He then spent 28 days in the camp hospital, some 5 or 6 weeks in his barracks, and was medically discharged on June 25, 1943, when he came back to East St. Louis. After his return, he applied to Thomas J. Byrne, appellant's freight agent, for re-employment and was refused. He passed a physical examination through the same Dr. McQuillan for employment by the Aluminum Ore Company, where he worked about nine months. He was first employed as a guard, and for the last 4 or 4½ months sacking ore. He described the latter work as heavy and deleterious to his back and he quit, going to Evansville, Indiana, where he worked two weeks. This work was, as he described, too heavy and he came back to East St. Louis, and after an interval of four or five weeks, secured employment at the plant of the Socony-Vacuum Company, making chemical tests. He was still so employed at the time of the trial. Appellee testified that he never took any medicine to alleviate the condition which he described. No treating physician testified at the trial. The record is silent as to whether his earning capacity was decreased after the fall; also, it appears that he has not incurred any medical expense. He described himself as being unable to work steadily and claimed that his

back was the source of continual pain and distress. There was, however, no objective evidence of injury.

Appellee is entirely uncorroborated on a single element of his testimony, except that it was admitted that the accident in question was reported to the company not on the date of its supposed occurrence, but two days later.

E. C. Pfarrer, the railroad freight house foreman, testified that he was not present on March 15, 1943, when the car in question was moved; that he left the premises at 1:00 o'clock on that day for lunch and did not return until 2:00 p. m. He denied that he had ordered appellee to "spot" this car, denied in its entirety, the statement attributed to him that he knew the car mover had been out of order, but had nevertheless ordered its use, denied that any accident had been reported to him by appellee on March 15; denied that he had assisted in applying mercurochrome to appellee's hand, and denied that he had instructed appellee to do light work during the remainder of the afternoon of March 15. He testified that the first complaint made by appellee as to being injured was made on March 17, and at that time, he sent appellee to Dr. McQuillan.

Andrew Jordan testified that he was one of appellee's "gang" that he remembered the incident of the car being moved on March 15; that it had to be moved about three feet; that he had a pinch bar in his hand and directed a general order to the rest of his group to get the car mover; that no particular person was indicated, but that appellee got it; that he and Doc. Harrison were at the northeast corner of the car in question and appellee and Mose Reed were at the southeast corner; that appellee used the car mover, he used the pinch bar, and Reed and Harrison used their hands; that the car was moved and that he did not see

appellee fall during the operation, although he was less than 5 feet away from him; that at no time during March 1943, did he see appellee moving a car by himself or see him fall; that this car was the only car moved by hand in March 1943, and that the car mover was utilized rarely; that he did not know anything of appellee's supposed accident until two days later when appellee told him that he had hurt his back.

Mose Reed testified to the same effect and said that he did not see appellee fall and did not know that appellee had claimed to have been injured on March 15, 1943, until the second day thereafter; that appellee worked all day with the gang up until 5:00 o'clock, and was not doing light work, as he claimed.

Nathaniel Harrison testified to substantially the same facts as did Reed and Jordan. He said that he did not see appellee fall and that the entire gang had participated in the moving of the car on March 15; he also said that appellee had not reported any injury until March 17.

The witnesses Pfarrer, Thomas A. Doyle, Jordan, Reed and Harrison all testified that the car mover in question was the only one used at the terminal. Appellee, himself, stated that only one was in use. All of appellant's witnesses identified the car mover in question, which was produced in court as an exhibit, calling attention to initials placed thereon by a former foreman. All testified that the car mover was never repaired; that it was in good working condition on March 15, 1943, and was in the same condition at that time as when produced in court. Some of the witnesses testified that when the appellee's suit was started, the tool was taken out of service and placed in the company vault, apparently for use as evidence.

It was established by the testimony of Thomas J. Byrne, that the car mover had been purchased by appellant company on December 1, 1941. Chalon Aitken, a general utility repair man, testified that he had

never repaired this car mover, and there was also testimony that the tool had never been sent to the general repair shop of the railroad for repairs.

On cross-examination, appellee failed to point out any defects in the car mover, saying he was not a mechanic. On rebuttal, however, and based upon an examination which took place during a court recess, he pointed out some supposed differences between its physical condition at the time of trial and upon March 15, 1943.

Dr. McQuillan was dead at the time of trial. The only medical witness called upon behalf of appellee was Dr. R. L. Campbell, who testified that he had seen and examined appellee on three occasions, January 12, 1944, May 8, 1944 and November 12, 1944; that he had not treated appellee; that he found on his first examination an inflammation of a muscle in the back and that this condition could have been produced by a violent trauma; he could not tell how long the condition which he found would last.

Appellee claims to have reported for work on March 16, 1943, the day following the accident. In this he is disputed by all of his fellow-workmen and by the company time-sheet, which was introduced in evidence. There is no pretension that the injuries which appellee claims were disabling. He admittedly remained at work during the balance of the day of March 15, 1943, and until he joined the Army. He worked only one hour on the following Sunday. When he returned to civilian life in June, he continued to work steadily. During the 17 months that intervened up to the time of trial, he was gainfully employed with the exception of a short interval during which he was seeking employment. Although he describes his physical condition as being one of almost continual pain and distress during this interval, it does not appear that he ever secured or sought any medical advice or treatment.

The nature and character of his fall is also unusual in the light of its claimed effect. His own version shows that he fell in a forward direction on his right hand, which became imbedded with cinders and slightly lacerated. From this position he says that he twisted on his left side over on his back. It is difficult to perceive how appellee's back could have struck the rail with sufficient force to inflict the injuries complained of under the circumstances which he narrates.

As we have before stated, appellee's story stands without corroboration. On the other hand, he is contradicted on almost every material element by several witnesses whose interest in the lawsuit cannot be fairly said to have been as great as his own. It was appellee's obligation to prove that the railroad company furnished him with an unsafe tool, that he used the tool in the manner intended, and that its defective condition was the proximate cause of the injury producing the accident. (*Palmer v. Wichita Falls & N. W. Ry. Co.*, 60 Okla. 205, 159 Pac. 1115.) The evidence in this case falls far short of this goal.

Counsel for the appellee calls the court's attention to such cases as *Tennant v. Peoria & P. U. R. Co.*, 321 U. S. 29, 64 Sup. Ct. 409, 88 L. Ed. 520; *Summers v. Hendricks,* 300 Ill. App. 498. In the *Tennant* case there is among other things said that "courts are not free to reweigh the evidence and set aside jury verdicts merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." In the *Summers* case, it is said that where the proofs bearing upon the questions of negligence and proximate cause are conflicting and raise questions of fact, that the verdict of the jury must not be set aside as against the weight of the evidence. We have no quarrel with these pronouncements and the rules announced in these cases. They are well known established principles of law. It is an equally well known and estab-

lished principle of law that, which qualifies the foregoing rules, where an examination of the record shows that the verdict of the jury is clearly against the manifest weight of the evidence, it is the court's duty to set it aside. (*Bradley v. Palmer,* 193 Ill. 15; *Hebard v. Tilley,* 134 Ill. App. 1.)

The general evidentiary situation in the case of *Springfield Electric Light & Power Co. v. John J. Mott,* 120 Ill. App. 39, is so similar to this case that we quote therefrom commencing on page 40:

"Appellees right of recovery in this case is predicated upon his uncorroborated version of the occurrence in question. He testified, that in response to the call of the foreman Flannigan, he and one Evans went to Flannigan's assistance in unloading poles from a wagon; that they lifted the large end of the pole from the wagon bed onto the front wheel of the wagon and lifted the small end of the pole onto the hind wheel; that while the pole was resting on the four-inch tires of the wagon wheels, Flannigan directed appellee and Evans to 'hold it;' that Evans held the pole at the small end and appellee at a point five or six feet from the small end, about as high as he could reach; that Flannigan, without giving any warning as to what he was going to do, went to the opposite side of the wagon and jerked the large end of the pole with a crow-bar; that as the large end of the pole went down the small end went up and threw appellee down and under the pole; that as he was jerked up and thrown down he felt something burst in his bowels; that he lay under the pole on the ground about ten seconds before he was able to crawl out; that the injury immediately developed an external swelling as large as his arm, diagnosed by the physician, who attended him for the first time on June 22, 1904, as an inguinal hernia. The witnesses Evans, Flannigan, Womach and DeFrates, all of whom were within a few feet of appellee and in a position to observe what

took place when, as he testifies, he was thrown down and laid on the ground ten seconds, did not see him struck or jerked by the pole or fall to the ground. To none of the persons present, did appellee mention the fact of his injury, except as he testifies, he said to Evans, 'By gosh, that pretty near done me up,' and as to this alleged remark he is not corroborated by Evans. Notwithstanding the serious and painful injury claimed to have been then sustained by appellee, he continued the work of digging holes the same day and for days and weeks immediately following. That appellee has a hernia does not admit of doubt, but it is incumbent upon him to show by a preponderance of the evidence that it resulted from the negligence of appellant upon the occasion and under the circumstances alleged in his declaration. We have no hesitancy in saying that this appellee failed to do, and that the verdict of the jury upon that issue is against the manifest weight of the evidence in the record.''

Because of the view which we take, it is unnecessary to discuss the question of whether the damages are, or are not excessive.

■ In our opinion, the verdict and judgment in this case are clearly against the manifest weight of the evidence, and this judgment must be reversed and cause remanded for new trial.

*Reversed and remanded.*